IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| ROBERT MARK SCHMIDT, et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) Case No. 18-1472 (RDA/JFA) |
| FCI ENTERPRISES LLC, et al., | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF A. HUGO BLANKINGSHIP, III

A. HUGO BLANKINGSHIP, III, being duly sworn, deposes and states as follows:

1. I am over 21 years of age and otherwise competent to make this declaration. I have personal knowledge of the statements contained herein. The statements herein are true and correct to the best of my knowledge, information, and belief.

2. I am a member in good standing of the Virginia State Bar (VSB # 26424) and admitted to practice before this Court. I received by B.A. from the University of Virginia in 1982 and a J.D. from the Marshall-Wythe School of Law at the College of William & Mary in 1986. I was a law clerk to the Honorable Albert V. Bryan, Jr., former chief judge of the U.S. District court for the Eastern District of Virginia. I have been licensed to practice law since 1986. I am a partner in the law firm of Blankingship & Christiano, P.C.

3. I have practiced in the courts in the Commonwealth of Virginia as well as the federal court in Eastern District of Virginia. I have appeared before the Supreme Court of the United States, the Fourth Circuit, multiple Federal District courts and the Supreme Court of Virginia. I have tied numerous cases involving complex litigation with fee -shifting provisions.

4. I have been asked to serve as an expert for Plaintiffs in support of their application for an award of attorneys' fees. My regular hourly rate is $600.00. I am not receiving any contingent fee in any way upon the Court's decision. In particular, I have been asked to opine about the hourly rates charged by attorneys in the Northern Virginia market for legal services similar to those provided in this case by Plaintiff's counsel, Brad Weiss, Kimberly MacCumbee and Travis Salisbury and the law firm of Charapp & Weiss, LLP. ("C&W").

5. I have known Mr. Weiss and his firm for approximately 20 years, and I am generally familiar with his experience and qualifications. Mr. Weiss and I have been on the opposite sides of many cases and I am very familiar with his firm, their abilities and litigation skills.

6. In the course of my practice, I appear on a regular basis in the Eastern District of Virginia in many complex civil litigation matters representing plaintiffs where there is a fee-shifting statute. I am well aware of the hourly rates charged by attorneys in the Northern, Virginia area generally, for civil litigation in federal court and including complex cases.

7. Furthermore, in the course of my litigation practice, I have applied for, numerous fee applications under fee-shifting statutes and rules. Through that fee litigation I also have become familiar with the hourly rates charged for federal civil litigation in Alexandria, and Northern Virginia generally, and with the case law formulae and factors to be applied in determining the reasonableness of attorneys' fees. I have consulted on various occasions with Craig C. Reilly, Esq. about legal fees and legal fees petitions in this court.

8. In forming my opinions, I considered materials and information from several sources. First, I interviewed Mr. Weiss, counsel for Plaintiffs regarding the facts and issues involved in this case. Second, I reviewed the Docket and read the Court's November 5, 2019 Memorandum Opinion and Order [Dkt. No. 125]. Third, I reviewed the Plaintiffs' Motion for

2

Attorneys' Fees and Costs and supporting Memorandum. Fourth, I reviewed Plaintiff's Settlement Conference Statement. Fifth, I reviewed the biographies of the principal lawyers for Plaintiffs available on the C&W website. Sixth, I reviewed a summary of lawsuit, discovery and communications regarding discovery and threats of sanctions throughout the case, as well as the efforts made by Plaintiffs' counsel. I also took into account in this case a review of the fees that were reduced by counsel and compared it to the fees asserted by Defendants' counsel in their draft Motion for Rule 11 sanctions as a comparator.

## THE METHODOLOGY

9. In analyzing the reasonableness of the fees, I understand that the Court will apply the Fourth Circuit's three-step formula.[1] Under the Fourth Circuit's formula, the first step is to determine a "lodestar" figure by multiplying the number of reasonable hours expended times a reasonable hourly rate. In deciding what constitutes a reasonable number of hours and a reasonable rate, the Court also would analyze any applicable *Johnson/Barber* factors.[2] In the second step, the Court would subtract fees for hours spent on unsuccessful claims that are unrelated to the successful ones for which fees are being awarded. Finally, in the third step, the Court may adjust the potential award depending upon the degree of success attained.

10. The *Johnson/Barber* factors are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7)

---

[1] *See Grissom v. Mills Corp.*, 549 F.3d 313, 320-21 (4th Cir. 2008); *Robinson v. Equifax Info. Serv., LLC*, 560 F.3d 235, 243-44 (4th Cir. 2009) (explaining the three steps of *Grissom* test).

[2] *See Barber v. Kimbrell's*, 577 F.2d 216, 226 (4th Cir. 1978) (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

11. The principal determinants in the analysis are the time reasonably expended and the appropriate hourly rates, which are multiplied to calculate the lodestar amount.[3] Because I am only opining on the reasonableness of the hourly rates, I will focus on *Johnson/Barber* factors (3), (5), (9), and (12), which figure in the determination of the appropriate hourly rates.

12. The regular hourly rates charged by Plaintiffs' counsel Mr. Weiss, Mrs. MacCumbee, Mr. Salisbury, and as charged in this action, are stated in the bills and I found those rates to be reasonable if not below market rate.

13. Determining "a market rate in the legal profession is inherently problematic, as wide variations in skill and reputation render the usual laws of supply and demand largely inapplicable."[4] Based on my analysis, and as explained below, it is my opinion that the rates of Mr. Weiss, Mrs. MacCumbee, Mr. Salisbury are appropriate and reasonable in light of the skills and experience of the Charapp & Weiss attorneys, and those rates are within "the prevailing market rates in the Northern Virginia market for the type of work for which Plaintiffs seek an award."[5]

---

[3] *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).
[4] *Grissom*, 549 F.3d at 321 (citations omitted).
[5] *Id.* (citations omitted).

4

## THE APPROPRIATE HOURLY RATES

### A.     The Type of Work and Relevant Market.

14.     The Plaintiffs comprise 22 individuals who worked for a company known as FCI. FCI was a government contractor with approximately 150 employees. The company had one location in Chantilly, Virginia but many employees were sent to government sites in the area and some outside the area to report to work.

15.     According to the lawsuit and the Court's November 5, 2019 Memorandum Opinion and Order, on or about October 8, 2018, FCI shutdown without notice and failed to pay any employees for the prior three weeks including the 22 Plaintiffs. The Plaintiffs lost wages, benefits and had their 401k plans frozen with some Plaintiffs assessed penalties associated with the termination of their retirement plan by FCI. Plaintiffs sought counsel from C&W. A demand was made prior to filing the lawsuit and the defense rejected it. Plaintiffs sued under the Worker Adjustment and Retraining Notification Act ("WARN Act") (Count I) and the Fair Labor Standards Act ("FLSA") (Count II).

16.     It is further understood that soon after the filing of the Complaint, defense counsel began a campaign wherein threats of sanctions were made throughout the case. Approximately a month after the filing of the Complaint, and in the midst of private settlement discussions between the parties, Defendants' counsel sent a letter with the first threat of Rule 11 sanctions and demanded Plaintiffs withdraw their claims.[6] Just prior to the September 25, 2019 scheduled Settlement Conference before Magistrate Judge Anderson, Defendants once again renewed their threat of sanctions, this time serving a draft motion for sanctions and safe harbor

---

[6] Defendants' counsel failed to follow the Rule 11 safe harbor prerequisite filing of serving the draft sanctions motion.

5

letter wherein counsel for Defendants represented that they had incurred approximately $635,298 in legal fees to date. That was followed up by a settlement demand that the Plaintiffs pay the defense $400,000 towards their legal fees. While these tactics might have frightened off lesser counsel, it came as no surprise to me that Mr. Weiss continued ahead despite the risks and concerns that even if they were to prevail it would be a challenge to collect on any prospective judgment.

17. Plaintiffs' claims survived an aggressive motions practice by Defendants, which included a Motion to Dismiss, a Motion for Rule 7(a)(7) Reply, and a Motion for Summary Judgment. Defendants' motions were denied, and Plaintiffs' claims proceeded through trial. The jury returned a verdict in favor of Plaintiffs on Count I only and the Court affirmed that verdict. Although there was some overlap between the counts, Counsel for Plaintiffs seek legal fees and costs primarily relating to Count I based on my review and understanding from talking to Mr. Weiss.

18. Given the nature of the causes of action, the triable issues of fact, the amount of damages sought, the legal framework governing these sorts of claims, and the corporate size of the defendant, this case was complicated, and I would categorize it as high-stakes, high-risk employment litigation. Plaintiffs needed highly skilled counsel to prosecute these claims and more importantly needed to locate such counsel that were willing to take significant risks to champion their cause. I know of few firms that would have accepted these challenges.

19. The relevant market for legal services in this sort of high-stakes employment litigation is not simply defined by geographic borders or jurisdictional boundaries. When searching for capable counsel for this sort of case against a sophisticated government contractor company with venture capital owners, plaintiffs would likely consider retaining premier firms from

Virginia, as well as the adjacent jurisdiction of the District of Columbia, that specialize in representing employees in complex cases. Similarly, corporate defendants may retain lawyers from either Virginia or the District of Columbia as defense counsel. In this sort of case, therefore, the relevant market analysis for legal services should reasonably include both jurisdictions, and so consideration of billing rates from the District of Columbia may be appropriate in determining the reasonable hourly rates, even though the law firm retained by Plaintiff, C&W, is from Northern Virginia. Thus, in my opinion, the Adjusted Laffey Matrix warrants consideration (but not dispositive weight) in this analysis. Indeed, the defense hired a national law firm known as Vedder & Price with an office in the District of Columbia.

**B.      Applying the Johnson/Barber Factors.**

*Factor 3: The Skill Required to Properly Perform the Legal Services Rendered*

20.     This factor is important to my analysis. In complex litigation in the Northern Virginia legal market, most lawyers and law firms will represent a mix of plaintiffs and defendants; despite having a mix, lawyers and law firms tend to specialize in serving as counsel to *either* plaintiff-employees *or* defendant-employers. Nonetheless, the employment lawyer prosecuting an individual plaintiff's claim or claims against a corporate employer must possess legal skills, experience, and litigation capabilities at least equal to those of the lawyers and law firms that the defendant-employer is likely to engage.

21.     In this region, companies regularly retain top of-the-line lawyers from major national (and international) law firms to defend them in complex and high-stakes employment cases. National firms like Vedder & Price, have a "labor and employment" department whose attorneys specialize in defending corporate employers in employment and labor cases brought by individuals in Northern Virginia. Indeed, Vedder & Price is a national firm with three

7

hundred lawyers an entire department devoted to labor and employment matters including litigation. It is believed that Vedder & Price counsels clients on the WARN Act matters.

22. When plaintiffs sue a corporation in a high-stakes a labor and employment case, defense firms of the highest-caliber are likely to appear as defense counsel, as occurred here. The defense firms in this action ("Vedder & Price"), have premier employment law practices with lawyers who specialize in representing corporate employers. Vedder & Price is a national firm with office throughout the US and abroad. Significantly, the defense lawyers in this action were not from Northern Virginia, but from the DC office of Vedder & Price.

23. That, in turn, warrants consideration of the hourly rates charged by defense counsel when determining whether C&W's rates are reasonable in the market. Since the skills, experience, and litigation capabilities necessary to prosecute a such a case against a corporate employer are the same as those needed to defend the action, there should be some parity between the billing rates on both sides of the case. Accordingly, it is often appropriate for the court to inquire into the rates charged by defense counsel as a fair comparison to the rates charged by Plaintiff's counsel in such matters.

***Factor 5: The Customary Fee for Like Work***

24. This factor has several levels. First, employment and labor litigation customarily is billed on an hourly basis by plaintiff's counsel (knowing that any fee award from the Court will be on an hourly basis). Second, in this case, "like work" is high-stakes employment and labor litigation. Third, as I point out above, the skills involved in high-stakes employment and labor litigation are the same for plaintiff and defense counsel, and there should be parity between the billing rates on both sides.

25. In the *Vienna Metro* case (*see* ¶ 9 above), the court adopted a matrix of hourly rates for complex civil litigation in Northern Virginia, which was adopted by the Court in that case ("*Vienna Metro* matrix"). Those rates for 2011 are as follows:

**2011 Range of Hourly Rates in Northern Virginia[7]**

| Paralegal | 1-3 | 4-7 | 8-10 | 11-19 | 20+ |
|---|---|---|---|---|---|
| $130 – 350 | $250 – 435 | $350 – 600 | $465 – 640 | $520 – 770 | $505 – 820 |

Those rates have subsequently been applied by other courts in other types of complex, multimillion-dollar litigation (*see* cases identified in ¶ 9 above). The *Mantech* case, for example, was a multi-million-dollar theft of trade secrets case arising from the actions of an executive-level employee who left the plaintiff corporation to join a competitor corporation. That sort of complex litigation is typically handled by employment law specialists, like the firms on both sides of this case. Similarly, the Court used those rates as comparative rates in another recent employment law case.[8] Privately negotiated rates for complex litigation do not, in and of themselves, define the "prevailing market rate" for "like work," but "the rates charged in private representations may afford relevant comparisons" for determining the "prevailing

---

[7] Prior to the economic slow down, law firm hourly rates had climbed steadily on an annual basis. Since 2011, however, rates have remained the same or increased only slightly. *See* THE NATIONAL LAW JOURNAL, 2012 Billing Survey, p. 1, 9-11 (Dec. 17, 2012) (hourly rates for 2012 varied only slightly from 2011—up only by 3 to 5 percent). Accordingly, in my opinion, the rates in this table would be valid comparables for 2012 and 2013. Law firm rates have increased since 2013 with large firm partner rates increasing to over $1,000 an hour in some firms.

[8] *Tech Systems, Inc. v. Pyles*, No. 1:12cv374 (GBL/JFA), 2013 U.S. Dist. LEXIS 110636, *1920 & n.4 (E.D. Va. Aug. 6, 2013).

market rate" under federal fee-shifting statutes.[9] Although the court in the Eastern District of Virginia is not required to adopt the Vienna Metro Matrix, it certainly may assist the court as a useful guide.

26. In my opinion, the rates stated in the *Vienna Metro* matrix are valid comparables that should be considered when determining whether the rates charged by C&W are reasonable — that is, whether they are within "the prevailing market rates in the [Northern Virginia market] for the type of work for which [Plaintiff] seeks an award," which work is high stakes employment litigation. The rates charged by C&W are within or lower than the rates in the *Vienna Metro* matrix.

27. Similarly, as I explained above, the relevant market for legal services in this sort of litigation crosses jurisdictional lines, and so the Adjusted Laffey Matrix rates for the District of Columbia also are valid comparable rates in this analysis (but not determinative).[10] The Adjusted Laffey Matrix rates also are comparables for analyzing the C&W rates.

28. While the rates charged by Mr. Weiss ($550) and Mrs. MacCumbee ($475) are at the lower end or below the matrix guidelines, I would not put either of them in that category. In my opinion, their rates are significantly below what they could charge and well below what comparably skilled lawyers in this area do charge.

*Factor 9: The Experience, Reputation and Ability of the Attorney*

29. C&W firm has earned the reputation, confirmed by its experience and ability. The firm's lawyers, and particularly Mr. Weiss, have vast jury trial experience, and the firm has a proven track record. Therefore, this factor is also strongly supports the reasonableness of the

---

[9] *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

[10] *See* http://laffeymatrix.com/see.html (reviewed 11/18/2019).

hourly rates charged by C&W, which are within or below the comparable rates charged by typical defense firms in high-stakes employment and litigation.

### *Factor 12: Attorneys' Fees Awards in Similar Cases*

30. In my opinion, the *Mantech* and *Tech Systems* cases are "similar cases" for the purpose of comparable fee awards. In both of those employment and labor law cases, the judges used the rates stated in *Vienna Metro* matrix as comparables.

31. Accordingly, in my opinion, the rates charged by C&W are within the prevailing market rates in Northern Virginia for this sort of high-stakes employment and labor litigation or below that level.

FURTHER AFFIANT SAYETH NOT.

I, A. Hugo Blankingship, III, do hereby declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, the following to be true and correct to the best of my knowledge and belief:

Executed on this 19th day of November 19, 2019.

_____
A. HUGO BLANKINGSHIP, III